[Sac. No. 7796.   In Bank.   Oct. 26, 1967.]

PEARL THUMA HUMPHREY, Plaintiff and Appellant, v. THE EQUITABLE LIFE ASSURANCE SOCIETY OF AMERICA, Defendant and Respondent.

William H. Phelps for Plaintiff and Appellant.

Allan F. Grossman as Amicus Curiae on behalf of Plaintiff and Appellant.

Glenn D. Newton for Defendant and Respondent.

Chandler P. Ward as Amicus Curiae on behalf of Defendant and Respondent.

MOSK, J.—Plaintiff is the widow of Edgar C. Humphrey, who died while he was insured by defendant under a policy of group insurance issued to his employer, Pacific Gas and Electric Company (hereinafter called the employer). She brought this action to collect $13,000 allegedly due her as the beneficiary under the policy.[1] The trial court, sitting without a jury, found in defendant's favor, and plaintiff appeals from the ensuing judgment.

---

[1]Although the complaint prayed for judgment in the amount of $14,000, it appears that after the complaint was filed plaintiff accepted $1,000 of this amount paid to her by defendant. Thus, plaintiff asks for only $13,000 on appeal.

The controversy here does not involve the broad question whether Humphrey was insured under the policy but whether he was insured for $1,000 as a retired employee or for $14,000 as an employee in his first year of disability as defined by the policy. This is reduced to two problems: first, whether under the provisions of the certificate issued to Humphrey by defendant he was entitled to $14,000 because he occupied the dual status of a retired and a disabled employee at the time of his death; and second, whether the provisions of the certificate prevail if, as we may assume for the purpose of this discussion, they provide broader coverage than the text of the master policy. Both of these questions, as hereinafter appears, will be answered in the affirmative.

The policy in the instant case, like those which were the subject in *Elfstrom* v. *New York Life Ins. Co., ante,* p. 503 [63 Cal.Rptr. 35, 432 P.2d 731], and *Walker* v. *Occidental Life Ins. Co., ante,* p. 518 [63 Cal.Rptr. 50, 432 P.2d 746], required the employee to contribute a portion of the premium. The employer dealt directly with its employees in regard to the insurance, and the certificates were issued by defendant and distributed through the employer. Humphrey commenced working for the employer in 1945 and a few years thereafter he applied for and was issued a policy of group insurance in the amount of $14,000.

The certificate issued thereunder contained, under the heading "Amount of Insurance," a table indicating the amount of coverage to which employees in various salary classifications were entitled. Those who earned between $550 and $600 a month, as did Humphrey, were eligible for $14,000 in life insurance. After this table appeared the statement, "The amount of insurance of any employee shall be reduced upon retirement to $500 [later amended to $1,000]." The next paragraph was headed "Termination of Insurance." It provided: "The insurance upon the life of the Employee under said Group Life Insurance policy shall automatically cease upon the occurrence of any of the following events . . . (c) the termination of his employment in the classes of employees insured thereunder. Note: Cessation of active work by an employee will constitute termination of his employment *except* (1) *where the employee is retired,* in which case his insurance will be continued during the period of such retirement but at the reduced amount of $500 [later amended to $1,000]; (2) *where the employee becomes disabled by injury or disease, in which case his insurance will be continued for*

*the full period of such disability up to but not beyond one year. . . .* At the expiration of the period mentioned in (2) . . . unless the employee shall then return . . . to active work, his insurance shall terminate automatically.'' (Italics added.)

The master policy, in a paragraph headed ''Amount of Insurance,'' provided that if an employee ceased active work because of retirement, the amount of his insurance was subject to reduction to $1,000.

In March 1961 Humphrey was found by his doctor to be suffering from pulmonary emphysema, a severe, chronic and incurable disease. Although advised to retire from work because he was very ill, he continued his regular duties until July 27, 1962. Between that date and December 25, 1962, he took accumulated sick leave and vacation and was paid his regular salary. Thereafter, he requested and was granted a leave of absence without pay ''to recover from illness.'' In his application he stated that he would return to work when his leave of absence expired or when he received permission from his doctor to do so.

Under the employer's regulations a leave of absence could not be granted for more than one year and if, after that period, an employee who had taken a leave for illness was not well enough to return to work, he could apply for retirement benefits. Humphrey's physical condition deteriorated rapidly and, on April 23, 1963, Arthur M. Kezar, the employer's local personnel manager, visited him at his home and discussed the possibility of retirement. He outlined the various benefits to which Humphrey would be entitled in the event he retired and, although Kezar could not recall specifically whether he mentioned the group insurance policy, he testified he ordinarily told an employee who was considering retirement that he ''gains a $1,000.00 paid up life insurance policy.'' Two days later Humphrey executed an application for retirement, to be effective July 1, 1963.

On June 13, the employer sent him a letter congratulating him on his retirement and reviewing the benefits to which he was entitled. The letter stated in part, ''As a member of the Group Life Insurance Plan, your insurance terminates thirty-one days after you are retired on pension. The Company will continue on your behalf paid-up insurance in the amount of $1,000 entirely at its own expense and you will receive a policy for this coverage.'' Sometime in June, Kezar and two other officials of the employer came to Humphrey's

home and presented him with a wallet and a $1,000 life insurance policy issued by defendant. At this time Humphrey was gravely ill, required the frequent use of an apparatus to assist him in breathing, and would occasionally lapse into unconsciousness. He died on August 26, 1963, and defendant later paid $1,000 to plaintiff under the policy.

The trial court found that Humphrey was totally disabled from July 27, 1962, to the time of his death on August 26, 1963, that he left his employment because of the disability, and that under the terms of the master policy his coverage was reduced to $1,000 on retirement.

Plaintiff maintains that Humphrey was insured for $14,000 under the provisions of the certificate quoted above because he occupied the status of a disabled employee under subdivision (2) of the ''Termination of Insurance'' clause, that subdivision (1), relating to reduction of insurance on retirement, was an independent provision and the benefits set forth thereunder were cumulative to those of subdivision (2), and that there was no language in the certificate requiring the reduction of insurance of a disabled employee who retired while he was entitled to coverage as such. She points out correctly that under the master policy the one-year period during which the insurance of a disabled employee was continued commenced to run either on the date his disability actually began, or if later, one year from the date his regular sick leave with pay had terminated.[2] Here, as we have seen, Humphrey was on either vacation or sick leave with pay until December 25, 1962. Therefore, if we accept plaintiff's construction of the certificate, Humphrey would have been covered one year thereafter for the full $14,000 and he died on August 26, 1963, within that year.

We find plaintiff's contention regarding proper construction of the certificate to be persuasive. Nothing in the language of this document indicates that once an employee has attained the status of a disabled employee, as that term is defined in the policy, and he is thereby entitled to one year of coverage under subdivision (2), his retirement within the

---

[2]The policy in a provision entitled ''Individual Terminations'' stated that the insurance of an employee would cease upon cessation of active work except that employees were to be regarded as continuing their employment ''where the employee becomes disabled by injury or disease; for the full period of such disability but not exceeding a maximum period of one year from the later of (i) the date of its commencement or (ii) the date of the termination of regular sick leave with pay granted directly because of such disability.''

one-year period will result in the forfeiture of his right to full coverage for the full year of disability. The retirement and disability subdivisions appear to be independent of one another, each setting forth separate circumstances under which termination of active work will not be deemed to constitute termination of employment. ■ Even if there were some doubt about the matter, we would be compelled to hold, in view of the rule that any uncertainties in an insurance policy must be construed in favor of imposing liability (*California Comp. & Fire Co.* v. *Industrial Acc. Com.* (1965) 62 Cal.2d 532, 534 [42 Cal.Rptr. 845, 399 P.2d 381]), that Humphrey's right to one year of full coverage during disability was not defeated by his retirement.

■ Defendant relies upon provisions of the certificate entitled "Total and Permanent Disability" and urges that because Humphrey never made application for disability payments and would not have qualified for such payments in any event, since he became disabled after having reached the age of 60, he could not be viewed as a disabled employee under subdivision (2). There is no merit in this contention. The provisions cited by defendant relate to periodic payments to a disabled employee for inability to work. There is no compulsion to hold that merely because Humphrey would not have qualified for *disability* payments of this type he would also fail to qualify as an employee entitled to coverage during his first year of disability under the *life* insurance provisions of the policy.

■ Defendant also insists that when Humphrey retired, the $14,000 policy was canceled because no premiums were paid on it. If, as we conclude, defendant wrongfully canceled the $14,0000 policy and substituted therefor a policy with a value of $1,000, it cannot now assert that the cancellation of the larger policy occurred because of failure to pay premiums. The abortive cancellation was solely the act of defendant for which no responsibility may be shifted to Humphrey.

■ We come, then, to the question whether the certificate affording Humphrey coverage will prevail over the provisions of the master policy, assuming arguendo that the latter document would defeat his rights to $14,000 in coverage. Defendant relies on the following paragraph in the certificate: "This individual certificate is furnished in accordance with and subject to the terms of the said Group Life Insurance policy, which policy. and the application therefor, constitute the entire contract between the parties. This cer-

tificate is merely evidence of insurance provided under said Group Life Insurance policy, which insurance is effective only if the Employee is eligible for insurance and becomes and remains insured in accordance with the provisions, terms and conditions of the said policy.''

It is urged by defendant that the provisions of the master policy prevail because, under the quotation above, the insurance extended to Humphrey is specifically subject to the provisions of the policy and the stipulation as well as section 10207 of the Insurance Code provide that the certificate is not a part of the insurance contract.[3] We cannot agree that the master policy must prevail under these circumstances.

Section 10209 of the Insurance Code requires a group policy of insurance to contain a provision that the insurer will issue to the employer for delivery to the insured employee an individual certificate setting forth a statement as to the insurance protection to which the employee is entitled. The purpose of the section is to provide persons insured under group policies with information regarding the coverage afforded. Obviously, only accurate information will satisfy the statutory requirement. To hold that an incorrect description of coverage is adequate would thwart the legislative purpose.

In a case involving statutory, master policy and certificate provisions almost identical to those involved here, the Wisconsin Supreme Court in *Risk* v. *National Cas. Co.* (1954) 286 Wis. 199 [67 N.W.2d 385], held that the stipulations of the certificate prevailed. There, the master policy afforded medical benefits only to the ''wife'' of an employee, whereas the certificate stated that such benefits were payable to the ''spouse.''

In holding that an employee's husband was entitled to medical payments, the court stated (at p. 389) ''we see no possible purpose in the requirement of a certificate by sec. 204.32(2)(b)2, Stats., *supra,* if the certificate so demanded is to be without effect. We perceive no persuasion in respondent's proposal that the certificate may misrepresent the insurance protection without redress so long as it refers the holder to the master policy. Under such an emasculation of the purpose of the statute the representations of the certifi-

---

[3]Section 10207 of the Insurance Code provides: ''The policy shall contain a provision that . . . . The policy, the application of the employer and the individual applications, if any, of the employees constitute the entire contract of insurance.''

cate merely set a trap for the insured. On the contrary, if the statute is to be credited with any virility, the insured is entitled to rely on the certificate which the law requires the insurer to give him, at least in so far as the certificate purports to deal with those subjects which the statute commands it to cover,—namely, 'the insurance protection to which he is entitled, and to whom payable.' Benefits for disability of dependents are a part thereof.'' The court held that the question whether the certificate was a part of the insurance contract was irrelevant to its conclusion and that the insurer was estopped from showing that the coverage of the policy was more limited than that afforded by the certificate.

Although there are some decisions contrary to the holding of the *Riske* case (see, e.g., *Boseman* v. *Connecticut General Life Ins. Co.* (1937) 301 U.S. 196, 203 [81 L.Ed. 1036, 1040, 57 S.Ct. 686, 110 A.L.R. 732]; *Chrysler Corp.* v. *Hardwick* (1941) 299 Mich. 696 [1 N.W.2d 43, 45]; *Germain* v. *Aetna Life Ins. Co.* (1938) 285 Mich. 318 [280 N.W. 773, 776]; *Seavers* v. *Metropolitan Life Ins. Co.* (1928) 132 Misc. 719 [230 N.Y. Supp. 366, 370]), the weight of authority holds that the terms of the certificate are binding on the insurer (see e.g., *Prudential Ins. Co. of America* v. *Roberts* (5th Cir. 1966) 358 F.2d 394, 395-396; *John Hancock Mut. Life Ins. Co.* v. *Dorman* (9th Cir. 1939) 108 F.2d 220, 222; *Clauson* v. *Prudential Ins. Co. of America* (D.Mass. 1961) 195 F.Supp. 72, 78-79; *United Security Life Ins. Co.* v. *Harden* (1963) 275 Ala. 169 [153 So.2d 246, 247]; *Missouri State Life Ins. Co. v. Foster* (1934) 188 Ark. 1116 [69 S.W.2d 869, 870]). This result is easily justified upon the grounds that the individual certificate is the only document which the employee sees or is given at any time and that the insurer, who drafts the instrument in language it selects, cannot thereafter complain that it does not express the intention of the parties. (See 1 Appleman, Insurance Law and Practice (1965) pp. 68-70.)

■ Finally, defendant contends that Humphrey knew he was not entitled to $14,000 in coverage under the policy and was given notice that he would receive a $1,000 policy prior to his retirement.[4] This suggests that by accepting a

---

[4]In this connection defendant quotes from a memorandum of decision of the trial court in which, after concluding that Walker was bound by the provisions of the master policy reducing coverage to $1,000 upon retirement, the court wrote: ''Decedent, when on April 25, 1963 he requested retirement, was competent to transact business; he was not deceived or misled by defendant or by decedent's employer on the ques-

policy for the smaller amount Humphrey waived the rights accorded him by the certificate. There being no valid express waiver, we cannot find that an implied waiver occurred under the circumstances of the instant case. (See *City of Ukiah* v. *Fones* (1966) 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369].)

In view of our conclusion that the provisions of the certificate prevail, it is unnecessary to consider plaintiff's additional contention that regardless of the certificate she would have been entitled to the full $14,000 coverage under the master policy.

The judgment is reversed and the trial court is directed to enter a judgment in favor of plaintiff for $13,000, less the amount of insurance premiums, if any, which Humphrey would have been required to pay for a policy of this amount from December 25, 1962, to the date of his death on August 26, 1963, plus interest at the rate of 7 percent per annum from September 27, 1963. (Civ. Code, § 3287.)

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

On November 22, 1967, the judgment was modified to read as printed above.

---

tion of the amount of insurance coverage; and whether or not in April he had the question of reduced insurance coverage specifically in mind, he was placed on explicit notice thereof in June, prior to his retirement (Letter of June 13, 1963. . . )."