Vanessa SERRATO, an incapacitated person, by and through her guardian ad litem, Dora Serrato, Plaintiff–Appellant,

v.

JOHN HANCOCK LIFE INSURANCE COMPANY, Defendant,

and

Norton Lilly & Company, Inc. Employee Benefits Plan, Defendant–Appellee.

Vanessa SERRATO, an incapacitated person, by and through her guardian ad litem, Dora Serrato, Plaintiff–Appellant,

v.

JOHN HANCOCK LIFE INSURANCE COMPANY, Defendant–Appellee.

Vanessa SERRATO, an incapacitated person, by and through her guardian ad litem, Dora Serrato, Plaintiff–Appellant,

v.

JOHN HANCOCK LIFE INSURANCE COMPANY, Defendant,

and

Massachusetts Mutual Life Insurance Company, Defendant–Appellee.

Vanessa SERRATO, an incapacitated person, by and through her guardian ad litem, Dora Serrato, Plaintiff–Appellant,

v.

JOHN HANCOCK LIFE INSURANCE COMPANY, Defendant,

and

Teamsters Industrial Security Fund & Southwest Administrators, Defendant–Appellee.

Nos. 93–55290, 93–55292, 93–55295 and 93–55297.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1994.

Decided Aug. 2, 1994.

Sharon J. Arkin, Shernoff, Bidart & Darras, Claremont, CA, for plaintiff-appellant.

Rita Gunasekaran, Haight, Brown & Bonesteel, Santa Monica, Geoffrey T. Tong and Linda M. Lawson, Meserve, Mumper & Hughes, Los Angeles, and Julius Mel Reich, Reich, Adell, Crost & Cvitan, Los Angeles, CA, for defendants-appellees.

Before: FLETCHER, CANBY and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Vanessa Serrato appeals the district court's summary judgment determination that ERISA preempts her state-law medical benefit claims against the issuers, administrators, and underwriters of her parents' employee welfare benefit plans. We affirm.

**I.**

In December 1987, eighteen-year-old Vanessa Serrato underwent surgery following an automobile accident. During the course of an operation to amputate her leg, Serrato had cardiac arrest and suffered permanent brain damage.

At that time, Serrato was the beneficiary of two different employee welfare benefit plans, as defined and regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. First, Serrato was insured by the Teamsters Industrial Security Fund ("Teamsters Fund"), a multiple-employer, labor-management trust administered by Southwest Administrators, Inc. ("Southwest") and underwritten by Massachusetts Mutual Life Insurance Company ("MassMutual"). Serrato participated in the Teamsters Fund by virtue of her mother's employment with the Boyle–Midway Company, a contributing employer. Second, Serrato was insured by the Norton Lilly International, Inc. Health and Welfare Plan ("Norton Lilly Plan"), a group insurance program underwritten by John Hancock Mutual Life Insurance Company ("John Hancock"). Serrato participated in the Norton Lilly Plan by virtue of her father's employment with Norton Lilly International.

After the accident, both the Teamsters Fund (through MassMutual) and the Norton Lilly Plan (through John Hancock) provided benefit payments to Serrato. Subsequent events, however, soon caused MassMutual

884

and John Hancock to stop paying Serrato's claims. First, Boyle–Midway ceased operations in late 1987, thereby terminating Serrato's mother and withdrawing from the Teamsters Fund. Pursuant to the relevant group policy, MassMutual deemed Serrato to be totally disabled and extended her benefits for twelve months, until December 31, 1988. At that time, however, MassMutual's extension of benefits expired and the Teamsters Fund halted all payments. Second, the Norton Lilly Plan substituted Seaboard Life Insurance Company for John Hancock as underwriter of the fund, effective November 30, 1988. Pursuant to the relevant group policy, John Hancock also deemed Serrato to be totally disabled and extended her benefits for one month, until December 31, 1988. At that time, however, John Hancock's extension of benefits expired and the insurer halted all payments.

In January 1992, Serrato filed suit in district court against the Teamsters Fund, Southwest, MassMutual, John Hancock, and the Norton Lilly Plan, seeking damages for breach of contract and a declaratory judgment that she had, pursuant to California law, "vested" rights to continued medical benefits. Serrato contended that, under *Fields v. Blue Shield*, 163 Cal.App.3d 570, 209 Cal.Rptr. 781 (1985), her "right to receive benefits fully vest[ed] at the time of disability and [could] not be divested by subsequent termination of [her] polic[ies]." *Id.* 209 Cal.Rptr. at 790.

The district court disagreed and granted summary judgment in favor of the defendants, concluding that, even if *Fields* did establish a vesting rule, "[s]tate laws which purport to create or impose vesting requirements for ERISA plans are preempted by ERISA and therefore are inapplicable to the Teamsters Fund, Southwest, [ ] MassMutual, ... the Norton Lilly Plan, and John Hancock."

Serrato filed a timely appeal. "We review the district court's grant of summary judgment de novo. We also review de novo the district court's interpretation and application of ERISA provisions and its determination that ERISA preempts a state law." *Aloha*

*Airlines, Inc. v. Ahue*, 12 F.3d 1498, 1500 (9th Cir.1993) (citations omitted).

## II.

ERISA governs the operation of both the Teamsters Fund and the Norton Lilly Plan. *See* 29 U.S.C. §§ 1002(1), 1003(a). Under ERISA, "[h]ealth care benefits provided in an employee benefit plan are not vested benefits; the employer may modify or withdraw these benefits at any time, provided the changes are made in compliance with ... the terms of the plan." *Doe v. Group Hospitalization & Medical Servs.*, 3 F.3d 80, 84 (4th Cir.1993); *accord, e.g., West v. Greyhound Corp.*, 813 F.2d 951, 954 (9th Cir.1987) ("There is no language in ERISA which provides for the accrual of welfare benefits or guarantee[s] that such benefits are vested or nonforfeitable."); 29 U.S.C. § 1051(1); *see* H.R.Rep. No. 807, 93d Cong., 2d Sess. (1974) ("[The term 'accrued benefit'] is not intended to apply to certain ancillary benefits, such as medical insurance.... To require the vesting of the[ ] ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income."), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4726.

In this case, Serrato does not contend that the defendants violated the terms of her insurance plans by terminating coverage. Her action for continued benefits must fail, therefore, unless California's purported "vesting" rule applies to the two programs. We conclude that the state-law rule is one of general contract interpretation and that, as a result, ERISA preempts application of the rule to the benefit plans at issue in this case. Accordingly, we affirm the district court's summary judgment.

## A.

Through "one of the broadest preemption clauses ever enacted by Congress," *Aloha Airlines*, 12 F.3d at 1501 (quotation omitted), ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," 29 U.S.C. § 1144(a).

The pre-emption clause is conspicuous for its breadth. Its deliberately expansive language was designed to establish pension plan regulation as exclusively a federal concern. The key ... is found in the words "relate to." Congress used those words in their broad sense, rejecting more limited pre-emption language that would have made the clause applicable only to state laws relating to the specific subjects covered by ERISA.... [T]o underscore its intent that [the clause] be expansively applied, Congress used equally broad language in defining "State law" that would be pre-empted. Such laws include "all laws, decisions, rules, regulations, or other State action having the effect of law." [ ] 29 U.S.C. § 1144(c)(1).

A law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan. Under this broad common-sense meaning, a state law may "relate to" a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect. Pre-emption is [ ] not precluded simply because a state law is consistent with ERISA's substantive requirements.

*Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138–39, 111 S.Ct. 478, 482–83, 112 L.Ed.2d 474 (1990) (quotations and citations omitted).

Under this expansive framework, ERISA's preemption clause clearly encompasses California's purported vesting rule, which (as alleged by Serrato) would directly impact employee benefit plans by mandating coverage even where the language of a plan did not so provide. *See id.* at 142, 111 S.Ct. at 484 ("Allowing state based actions ... would subject plans ... [to] the potential for conflict in substantive law. It is foreseeable that state courts, exercising their common law powers, might develop different substantive standards applicable to the same employer conduct, requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction. Such an outcome is fundamentally at odds with the goal of uniformity that Congress sought to implement."). In fact, several Ninth Circuit cases

have recognized, in *dicta*, that ERISA does indeed preempt state vesting requirements. *See Aloha Airlines*, 12 F.3d at 1504 (ERISA preempts a "state law [that] imposes reporting, disclosure, funding, or *vesting* requirements for ERISA plans") (emphasis added); *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 897 (9th Cir.1990) (same); *Martori Bros. Distribs. v. James–Massengale*, 781 F.2d 1349, 1357 (9th Cir.) (same), *amended on other grounds*, 791 F.2d 799 (9th Cir.), *cert. denied*, 479 U.S. 949, 1018, 107 S.Ct. 435, 670, 93 L.Ed.2d 385, 722 (1986).

**B.**

Serrato does not seriously dispute this conclusion, contending instead that ERISA's "savings" clause precludes preemption in this case. The savings clause provides that ERISA preemption does not "exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). Serrato asserts that the *Fields* vesting rule constitutes a state law which regulates insurance and therefore is "saved" from preemption. We disagree.

The Supreme Court has delineated "several considerations in determining whether a state law falls under the savings clause." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). First, the Court takes "a 'common-sense view' of the language of the savings clause itself." *Id.* "A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Id.* at 50, 107 S.Ct. at 1554. Next, the Court analyzes the three factors used to determine which conduct constitutes a "business of insurance" under the McCarran–Ferguson Act, 15 U.S.C. § 1012(a): "*First*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Id.* at 48–49, 107 S.Ct. at 1553 (quotation omitted).

Although, in proper circumstances, "[d]ecisional law that 'regulates insurance' may fall under the saving clause," *id.* at 48 n. 1, 107 S.Ct. at 1553 n. 1; 29 U.S.C. § 1144(c)(1), we conclude *Fields* does not create a rule protected by the clause. In that case, a group insurer refused to pay the therapy expenses of the plaintiff, who was studying to become a psychoanalyst, on the ground that the policy excluded coverage for treatments that counted for educational credit. *Fields,* 209 Cal.Rptr. at 783–85. The plaintiff's original policy covered a " 'lifetime maximum' benefit payable 'for treatment of nervous and mental illness' of $50,000" and contained no relevant exclusions. *Id.* 209 Cal.Rptr. at 784. The insurer had, however, subsequently added to a renewal policy the educational-credit exclusion at issue. *Id.*

The *Fields* court held that the insurer could not enforce the subsequently-added exclusion for several reasons. First, the court applied the California law of adhesion contracts and concluded that "Blue Shield did not notify Dr. Fields by a clear, conspicuous notice in an expected place that coverage he originally had was now totally withdrawn." *Id.* 209 Cal.Rptr. at 786. Second, the court deemed the original policy to be ambiguous and held that, "[b]y conventional *contract law* the ambiguity must be construed against Blue Shield, the party who created the ambiguity. Where a health insurance contract is susceptible to different reasonable constructions, it is ambiguous—the insurance policy is to be strictly construed against the insurer." *Id.* 209 Cal.Rptr. at 789 (emphasis added). Finally, and most importantly, the court interpreted *the policy* to "evidence[ ] a clear *contractual intent* of Blue Shield to provide for nervous or mental illness which might persist for the lifetime of an insured; once treatment was begun for a specific mental illness Blue Shield was obligated to pay for it until a $50,000 lifetime maximum was reached. These benefits ... became vested as a matter of *legal and contractual right under language of the ... plan.*" *Id.* 209 Cal.Rptr. at 790 (emphasis added).

Only after conducting this extensive *contractual* analysis and concluding that the Blue Shield *policy* created a right to lifetime coverage did the *Fields* court engage in any discussion of "vesting." *Id.* 209 Cal.Rptr. at 790–92. Indeed, the court's entire analysis of vesting occurred in the context of considering whether the insurer could "cancel[ ] *vested, accrued* benefits of a group policy." *Fields,* 209 Cal.Rptr. at 790 (emphasis added). Thus, the court presupposed that the plaintiff's policy gave him vested rights, the very proposition Serrato claims that *Fields* establishes *as a matter of law.*

As a result, the most sensible conclusion is that *Fields* is a decision that merely applies general rules of insurance contract interpretation. In fact, another California appellate court recently reached just such a conclusion. In *Fraker v. Sentry Life Ins. Co.,* 19 Cal. App. 4th 276, 23 Cal.Rptr.2d 372 (1993), the court refused to ignore the plain language of an insurance policy that explicitly precluded the vesting of benefits. The court expressly "reject[ed] appellant's invitation to interpret *Fields* as an attempt by the appellate court in that case to enunciate a general rule of 'vesting' pertaining to health insurance policies, no matter what the policy language." *Id.* 23 Cal.Rptr.2d 372 at 375.

*Fraker* does not create a conflict between two state appellate divisions. The *Fraker* court read *Fields* as a case of contract interpretation, and we have no reason to believe the Supreme Court of California would not follow *Fraker's* sound reasoning. Accordingly, we conclude that Serrato's claims must fail:

California's common law of contract interpretation is not "specifically directed toward [the insurance] industry." Nor generally does it effect risk spreading or concern the policy relationship between the insurer and the insured beyond that to which the parties have agreed in the insurance contract. Accordingly, ... California's common law of contract interpretation is not a law that "regulates insurance," and therefore is not saved from preemption.

*Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 494 (9th Cir.1988) (quoting *Pilot Life Ins.,* 481 U.S. at 50, 107 S.Ct. at 1554), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); *accord Evans v. Safeco*

*Life Ins. Co.,* 916 F.2d 1437, 1440 (9th Cir. 1990); *cf. International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294, 299 (6th Cir.1991) ("[Plaintiffs argue] that Kentucky law, which forbids the cancellation of an insurance policy once liability has attached, is not preempted by ERISA.... [That rule, however, is] based on the common law of contracts as applied to agreements to provide insurance. Because the Kentucky law relied upon merely states a rule of general applicability, rather than a rule speicifically [sic] directed toward the insurance industry, ... [the] claim is not rescued by the saving clause.") (citations omitted), *cert. denied,* — U.S. —, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992).

We therefore hold that the savings clause does not preclude preemption of Serrato's purported state-law right to vested benefits.[1]

### III.

 ERISA preempts California's purported "vesting" rule because it "relates to" employee welfare plans. ERISA's savings clause does not apply because the state-law rule is not "specifically directed toward the insurance industry." As a result, the district court correctly granted summary judgment in favor of all the defendants in Serrato's action.[2]

**AFFIRMED.**

---

1. Because we reach this conclusion, we need not consider the Norton Lilly Plan's argument that, even if the savings clause applies, ERISA's "deemer" clause insulates it from application of the vesting rule because the plan is self-funded and therefore is not an insurance company under the statute. *See* 29 U.S.C. § 1144(b)(2)(B) (a self-funded employee benefit plan "shall [not] be deemed to be an insurance company" within the meaning of the savings clause).

We also need not consider Southwest's argument that it is not an ERISA fiduciary and therefore is not a proper party to the action. *See, e.g., Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.,* 990

F.2d 513, 516 (9th Cir.1993) ("ERISA permits suits for breach of fiduciary duty only against ERISA defined fiduciaries.... [T]hird party administrators ... are not fiduciaries under ERISA when they merely perform ministerial duties or process claims."); 29 U.S.C. § 1002(21)(A); 29 C.F.R. § 2509.75–8.

2. Because no court had considered the precise issue of whether ERISA preempts a state vesting rule, we deny the request of the Teamsters Fund and Southwest for an award of costs and attorney's fees pursuant to 28 U.S.C. § 1927 and Federal Rule of Appellate Procedure 38.